UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ANDREW DAVID HALL,

      Plaintiff,

v.                                Case No: 3:14cv140/MCR/CJK

C.O. MOORE, et al.,

      Defendants.

_____/

ORDER and
REPORT AND RECOMMENDATION

      This prisoner civil rights case, brought under 42 U.S.C. § 1983, is before the court upon defendants Gielow, Hood and Thornhill's motion for summary judgment and evidentiary materials.  (Doc. 54).  Plaintiff has responded in opposition, with evidentiary materials.  (Docs. 59, 60).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C).  After careful consideration, the undersigned concludes that defendants' motion should be granted as to defendants Gielow and Hood, but denied as to defendant Thornhill.

BACKGROUND AND PROCEDURAL HISTORY

      Plaintiff is an inmate of the Florida penal system currently confined at Jackson Correctional Institution.  (Doc. 59).  On March 20, 2014, plaintiff filed this § 1983

lawsuit against prison officials at Santa Rosa Correctional Institution ("Santa Rosa CI"), claiming they were deliberately indifferent to his health and safety by ignoring a prescribed medical pass restricting him to a low-tier cell due to a medical condition affecting his leg, and by requiring him to climb and descend stairs while in hand restraints. (Doc. 20). Plaintiff contends that as a result of defendants' deliberate indifference, he was exposed to a substantial risk of falling and, in fact, fell on April 15, 2013, resulting in injury. As relief, plaintiff seeks a declaration that defendants violated his constitutional rights, $50,000 in compensatory damages against each defendant, and $50,000 in punitive damages against each defendant. (*Id*.). The court has construed plaintiff's complaint as also requesting nominal damages. (*See* Docs. 43, 47).

On January 7, 2015, the court dismissed *sua sponte* plaintiff's claims against three defendants (Moore, Diamond and Simpson) for failure to state a claim upon which relief can be granted. (*See* Docs. 23, 26). The court has not directed entry of final judgment on those claims. The case was remanded to the undersigned for further proceedings on plaintiff's remaining claims – individual capacity claims against defendants Gielow, Hood and Thornhill for their alleged violation of plaintiff's Eighth Amendment rights. (*Id*.).

The court issued a scheduling order on July 2, 2015, providing for discovery. (Doc. 50). The discovery period closed on September 30, 2015. (*Id*.). Defendants Gielow, Hood and Thornhill filed their motion for summary judgment on August 21, 2015. (Doc. 54). Defendants seek summary judgment based upon qualified immunity. Defendants request that discovery be stayed pending resolution of the motion. (Doc. 54, p. 2 n.1). As the discovery period has passed, that request will be

denied as moot.  Plaintiff filed his response in opposition to summary judgment on October 23, 2015.  (Docs. 59, 60).

FACTS

The following facts are drawn from plaintiff's verified third amended complaint (doc. 20) and the evidence in the summary judgment record (docs. 54, 60). *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint and repeated in a separate affidavit must be considered in opposition to summary judgment).  Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the plaintiff."  *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d1262, 1265 (11th Cir. 2005).

Plaintiff has a history of sciatic nerve injury to his right leg with foot drop. (Doc. 60, Ex. B).  The effect of plaintiff's condition is paralysis in his lower right leg (doc. 54, Ex. A, Hall Depo., p. 8), causing that leg "to not function normally, having to drag it, while struggling to walk."  (Doc. 20, p. 6 ¶ 4; Doc. 60, Ex. A, Hall Decl. ¶ 14).  Plaintiff wears an ankle foot orthosis (AFO) brace on his right foot.  (Doc. 60, Ex. B).  Plaintiff does not wear a brace on his knee, as he is able to ambulate and stand without one.  (Doc. 60, Ex. B).  When plaintiff is merely standing, it is not readily apparent that he has a disability.  (Doc. 54, Ex. A, Hall Depo., pp. 8, 13-14). When plaintiff tries to walk, however, it is "very obvious" that plaintiff "is handicapped."  (Doc. 60, Ex. Q, Ponds Decl.; *see also* Doc. 54, Ex. A, Hall Depo., p. 36).  Plaintiff's medical records, which contain observations of medical personnel, describe plaintiff as walking with a limp.  (Doc. 54, Ex. B, pp. 16, 17).

Plaintiff arrived at Santa Rosa CI on March 7, 2013.  At that time, plaintiff had a Florida Department of Corrections Health Slip/Pass (hereinafter "medical pass")

from his prior institution, Dade Correctional Institution, authorizing a number of accommodations, including, as relevant here, an ankle brace, a cane, a low/bottom bunk and a low-tier cell. (Doc. 60, Ex. P (additional, more legible copy at Doc. 1, Ex. A)). The pass was effective from March 7, 2012, to March 7, 2013. (*Id.*).

After receiving a pre-special housing health screening, plaintiff was escorted to his assigned dormitory, Bravo Dormitory. (Doc. 60, Ex. A, Hall Decl. ¶¶ 3-4). There, plaintiff learned that he was assigned to wing three, cell 208, lower bunk (B3208l). (Doc. 20, p. 6 ¶¶ 1-3;[1] Doc. 54, Ex. C; Doc. 60, Ex. A, Hall Decl. ¶ 5). Plaintiff's cell was on the top tier of the dormitory. (Doc. 60, Ex. A, Hall Decl. ¶ 5). After plaintiff complained to the officers present (Sergeant Diamond and Corrections Officer Moore) that he had a medical pass for a low-tier cell, plaintiff was advised that his pass had expired and that he must report to his assigned cell or suffer the consequences. (Doc. 60, Ex. A, Hall Decl. ¶¶ 5-9).

On March 11, 2013, plaintiff signed up for sick call to renew his medical pass. (Doc. 60, Ex. A, Hall Decl. ¶ 10). On March 13, 2013, plaintiff was escorted to the medical station in Bravo Dormitory, for evaluation of his pass. (Doc. 60, Ex. A, Pl.'s Decl. ¶¶ 11-12). During the escort from his cell, plaintiff was assisted in descending the stairs by security officers, one of whom held plaintiff's arm(s). (Doc. 54, Ex. A, Hall Depo. p. 40). After plaintiff's vital signs were taken, he was escorted to an examination room. Defendants Hood and Thornhill were stationed at the door of the room. (Doc. 60, Ex. A, Pl.'s Decl. ¶ 16). Advanced Registered Nurse Practitioner (ARNP) M. Nichols reviewed plaintiff's medical records and examined plaintiff. (Doc. 60, Ex. B). Nichols noted with regard to her examination of plaintiff's

---

[1]References to page numbers of plaintiff's third amended complaint are to the numbers assigned by the court's electronic docketing system.

extremities:  "® AFO splint to foot – [no][2] brace on knee ambulating and standing fine [without][3] it".  (Doc. 60, Ex. B).  ARNP Nichols renewed plaintiff's pass for a low/bottom bunk, a low-tier cell, an AFO splint for his right foot, and soft shoes. (Doc. 60, Exs. B, C).  The pass was effective from March 13, 2013, to March 13, 2014.  (Doc. 60, Ex. C).  Nichols informed plaintiff that she was not renewing his pass for a cane, because canes were not allowed in close management.  (Doc. 20, p. 9 ¶ 27).  ARNP Nichols issued duplicate copies of the written medical pass to plaintiff and to defendant Thornhill, and instructed Thornhill to have plaintiff housed on a low tier.  (Doc. 54, Ex. A, Hall Depo., p. 9; Doc. 60, Ex. A, Pl.'s Decl. ¶ 16). Defendant Thornhill advised Nichols that the classification department, not the security department, was in charge of housing inmates, but that he would contact classification to have plaintiff moved to a low tier.  (Doc. 54, Ex. A, Hall Depo., p. 9; Doc. 60, Ex. A, Pl.'s Decl. ¶ 17).

Defendants Hood and Thornhill escorted plaintiff back to his wing.  (Doc. 60, Ex. A, Pl.'s Decl. ¶ 18).  Defendant Thornhill then ordered plaintiff to "climb the stairs boy".  (Doc. 60, Ex. A, Pl.'s Decl. ¶ 18).  Plaintiff complained and told Thornhill that ARNP Nichols just gave Thornhill a copy of plaintiff's pass for a low-tier cell, and that plaintiff's leg "is weak and in pain, and might[ ] collapse while having to struggle walking up the stairs to the top-tier again."  (Doc. 60, Ex. A, Pl.'s Decl. ¶ 18).  Plaintiff looked at defendant Hood, who responded, "[S]tupid ass don't get it do you[.]  Sergeant just told you to go upstairs, so get that look off you [sic]

---

[2]ARNP Nichols used an accepted abbreviation for "no", namely, an "o" with a horizontal line through it.  Defendants do not dispute this interpretation of the abbreviation.  *See* Doc. 54, p. 2 ¶ 3.

[3]ARNP Nichols used an accepted abbreviation for "without", namely, an "s" with a bar over it.  *See* TABER'S MEDICAL DICTIONARY at http://www.tabers.com/tabersonline/view/Tabers-Dictionary/767492/all/Medical_Abbreviations.

face." (Doc. 60, Ex. A, Pl.'s Decl. ¶ 18). Defendant Hood and/or Thornhill threatened plaintiff with physical force and a disciplinary report if he did not return to his top-tier cell. (Doc. 20, p. 10 ¶ 31). Plaintiff complied, but struggled as he ascended the stairs. (Doc. 60, Ex. A, Pl.'s Decl. ¶ 18; Doc. 20, p. 10 ¶ 31). Defendants Hood and Thornhill escorted plaintiff up the stairs, but offered no assistance. (Doc. 54, Ex. A, Hall Depo, p. 41). Plaintiff describes: "I complied as ordered struggling walking up the stairs in restraints, every other step I had to rest, due to my leg trembling and have to drag it." (Doc. 20, p. 10 ¶ 31). Defendants Hood and Thornhill witnessed plaintiff struggling to manage the stairs. (Doc. 20, p. 10 ¶ 31).

Plaintiff remained housed in a top-tier cell for the next thirty-three days. During that time, plaintiff complained repeatedly to security staff that his medical pass requiring a low-tier cell was being ignored. (Doc. 60, Ex. A, Hall Decl. ¶ 20). On one occasion during this time period, plaintiff stopped defendant Gielow while he was performing a security check, displayed a copy of the low-tier pass, explained that he was not supposed to be housed on the top-tier because of his medical condition, and complained that officers were ignoring the pass. (Doc. 60, Ex. A, Hall Decl. ¶ 20; Doc. 54, Ex. A, Hall Depo., pp. 55-56). Defendant Gielow read over the March 13, 2013 medical pass and asked plaintiff if his leg was broken. (Doc. 60, Ex. A, Hall Decl. ¶ 20). After plaintiff described his medical condition, defendant Gielow stated: "[T]his is not the Hilton Hotel we don't cater to monkey business, so stay off my door and don't let me hear about your whining to my officers anymore." (*Id.*). Gielow then walked away. (*Id.*). Although defendants Thornhill, Hood and Gielow state that they did not have authority to reassign plaintiff to a different cell, they do not dispute that they had the authority to inform the classification department of the

pass and to ask them to address the problem.  Neither Thornhill, Hood, nor Gielow states that he contacted the classification department or other appropriate official concerning plaintiff's housing assignment conflicting with his prescribed medical restriction.  (Doc. 54, Ex. E, Gielow Decl.; Ex. F, Hood Decl.; Ex. G, Thornhill Decl.).

On April 15, 2013, at 7:40 a.m., plaintiff was given the opportunity to attend the dayroom.  (Doc. 60, Ex. A, Pl.'s Decl. ¶ 21).  While plaintiff was in his cell, defendant Thornhill placed him in handcuffs and fastened the handcuffs to a security belt locked around plaintiff's waist.  (*Id*.).  After securing plaintiff, defendant Thornhill ordered him to go down the stairs and meet another officer (non-party Officer Ritchie) to have leg shackles placed on him.  (*Id*.).[4]  Another inmate, Donwick Ponds, was housed on the top tier of B-Dormitory on the same date and time in question.  (Doc. 60, Ex. Q, Ponds Decl., p. 1).  Ponds was called by defendant Thornhill to attend the dayroom just prior to plaintiff being called.  (Doc. 60, Ex. Q, Ponds Decl., p. 1).  Inmate Ponds testifies that he was restrained in the same manner as plaintiff and then ordered by defendant Thornhill to descend the stairs without assistance or escort.  (*Id*.).  All top-tier inmates attending the dayroom that morning were restrained as plaintiff was, and required to walk down the stairs without assistance or escort.  (Doc. 60, Ex. Q, Ponds Decl., p. 2; *see also* Doc. 60, Ex. R, Stallworth Decl., p. 2 (testifying that he was housed on the top tier of B-Dormitory on April 15, 2013, and that inmates leaving their cells to attend the dayroom were cuffed and told to go down the stairs to get leg restraints with no assistance or escort

---

[4]Defendant Thornhill disputes this fact, and states that he instructed plaintiff to remain at the top of the stairs until he could be escorted to the dayroom.  (Doc. 54, Ex. L, Thornhill Decl. ¶ 4).  The court accepts plaintiff's version as true at the summary judgment stage.

down the stairs)).  Inmate Ponds did not hear defendant Thornhill order plaintiff to wait at the top of the stairs.  (Doc. 60, Ex. Q, Ponds Decl., p. 2).  Had defendant Thornhill voiced such an order, Inmate Ponds would have heard it, because he was sitting in the dayroom area which is in the middle of the wing.  (*Id*.).  Inmates Stallworth and Davis, who witnessed plaintiff being removed from his cell that day, testify that neither defendant Thornhill nor any other officer escorted plaintiff once the hand restraints were placed on him.  (Doc. 60, Ex. R, Stallworth Decl.; Ex. T, Davis Decl.)

After plaintiff descended approximately ten steps, his right leg collapsed underneath him and he fell down the remaining stairs, a distance of thirteen or more steps.  (Doc. 60, Ex. A, Pl.'s Decl. ¶ 22; Doc. 54, Ex. D, p. 1).  Plaintiff's head struck the steel stairs numerous times and struck the concrete floor at the bottom of the stairs.  (*Id*.).  The fall knocked plaintiff unconscious.  (*Id*.).  The B-dormitory wing 3 cameras would have recorded plaintiff's fall.  (Doc. 60, Ex. Q, Ponds Decl., p. 1; Ex. R, Stallworth Decl., p. 2).  Plaintiff was awakened by Officer Ritchie telling him several times to not move.  (*Id*.).  Plaintiff's right leg was shaking; plaintiff could not turn his body at the waist due to pain "lash[ing] through [his] back and puls[ing] at the base of [his] skull."  (*Id*.).  Plaintiff's right leg was twisted and plaintiff could not feel anything in his right foot.  (*Id*.).  Medical staff arrived, and Nurse Hawkins noted that plaintiff complained of sharp pain to the bottom of his right foot.  (Doc. 60, Ex. K, p. 1).  Plaintiff stated he could not lift his right foot; however, when he was raised, his leg did not fall limp.  (Doc. 60, Ex. K, p. 1).  Nurse Hawkins noted that there were no signs of injury to the bone structure; there were no bone abnormalities; and the muscle structure appeared normal.  (Doc. 60, Ex. K, p. 1).  Nurse Hawkins placed plaintiff in a wheelchair and took him to the medical department for evaluation.  (Doc

.60, Ex. I, p. 1; Doc. 60, Ex. A, Hall Decl. ¶ 23).   Upon arrival at the medical department, plaintiff was examined by ARNP Nichols.  (Doc. 60, Ex. A, Hall Decl. ¶ 24).  Plaintiff states that he reported numbness in his feet and pain in his right leg, head and lower back.  (Doc. 60, Ex. A, Hall Decl. ¶ 24).  ARNP Nichols reported in plaintiff's medical record that plaintiff complained of pain in his right calf, stating that it felt like something was sticking him.  (Doc. 60, Ex. K, p. 1).  ARNP Nichols also reported that she saw "no obvious problem", but indicated she would have plaintiff placed in the infirmary until an x-ray was taken on his right fibula and tibia.  (Doc. 60, Ex. K, p. 1).  Plaintiff was admitted to the infirmary, where he was given 800 milligrams of ibuprofen for pain.  (Doc. 60, Ex. A, Hall Decl. ¶ 25; Doc. 60, Ex. K, p. 1).  Plaintiff was given ibuprofen for pain throughout his stay in the infirmary.  (Doc. 60, Ex. K).  An x-ray was taken on April 17, 2013, and did not reveal any broken bones.  (Doc. 60, Ex. K, p. 2).  Plaintiff was released to security in stable condition.  (*Id.*).  Plaintiff was escorted by security back to Bravo Dormitory, where he had been reassigned to a low-tier cell.  (Doc. 60, Ex. A, Hall Decl. ¶ 26).

On April 25, 2013, Defendant Thornhill wrote plaintiff a disciplinary report for disobeying a verbal order.  (Doc. 54, Ex. D).  Defendant Thornhill's report states, in relevant part:

> On April 15, 2013, I was assigned as a Close Management Housing Sergeant in B Dormitory at Santa Rosa C.I.  At Approximately 7:40am as present in wing three I was assiting [sic] with Dayroom activities.  I placed hand restraints on Inmate Hall, Andrew DC#435340, housed in B3208L and removed him from the cell to participate in Dayroom Activities.  I escorted Inmate Hall to the top of the stairs in the back of wing three and ordered him to stop and remain there until escorted to the dayroom.  I then placed restraints on Inmate Wright, Samuel DC#129547 housed in B3213U.  At that time I heard a yell, I turned and observed Inmate Hall fall from approximately the tenth step

on the staircase to the floor.  Officer Ritchie was the first to respond and assisted Inmate Hall until Nurse Hawkins arrived.  Inmate Hall was seen by Medical and place [sic] into the Infirmary for evaluation.  The shift supervisor was notified and authorized this report.  Inmate Hall will remain in his current status pending Disciplinary Team action.  This D.R. was rewritten due to a technical error.  Prior log # 119-131027.

(Doc. 54, Ex. D, p. 1).  Plaintiff was found guilty of the infraction "[b]ased in part upon the statement of facts provided by Officer Thornhill and the completed investigation."  (Doc. 54, Ex. D, p. 2).

On April 23, 2013, plaintiff submitted a sick call request, complaining of back pain, pain on the bottom of his feet ("like something sticking me"), and headaches. (Doc. 60, Ex. L).  Plaintiff was seen in sick call on April 24, 2013.  (Doc. 60, Ex. M). Plaintiff's history of back problems was noted as "neuropathy sciatic nerve injury", for which plaintiff received ibuprofen as treatment.  (Doc. 60, Ex. M).  Plaintiff reported that the pain was "on and off"; that the pain level was a 3 on a scale of 1-10; and that the pain had started again when he fell.  (Doc. 60, Ex .M).  Plaintiff described an "aching" pain in his right lumbar region, with the pain radiating down to his right leg and foot, and increasing when walking.  (Id.).  Plaintiff also reported intermittent numbness or tingling in his right leg.  (Id.).  The examining nurse noted, upon her objective evaluation, that plaintiff was limping and that there was no swelling or discoloration/bruising of his back.  (Id.).

On May 8, 2013, plaintiff submitted another sick call request, complaining of sharp pain in his lower back, intermittent headaches and pain in his leg and feet. (Doc. 60, Ex. N).  Plaintiff was seen in sick call on May 9, 2013.  (Doc. 60, Ex. O). Plaintiff complained of sharp pain in the right and left lumbar region.  (Doc. 60, Ex. O).  Plaintiff reported that the pain began on April 15, 2013, when he fell down the stairs, and that the pain level was a 10 on a scale of 1-10.  (Doc. 60, Exs. N, O.).

Plaintiff reported that nothing decreased or relieved the pain, and that he needed stronger pain medication. (*Id*.). Plaintiff also reported that he had numbness or tingling in his right leg and foot. (*Id*.). The examining nurse noted, upon her objective evaluation, that plaintiff was limping, that there was no swelling or discoloration of his back, and that he had a brace to his right foot. (Doc. 60, Ex. O).

Plaintiff's medical records indicate that prior to plaintiff's transfer to Santa Rosa CI, plaintiff was seen in the Dade CI medical department on October 1, 2012, after a use of force incident, where he complained of pain in his right lumbar region. (Doc. 54, Ex. B, pp. 16-19).

Records of plaintiff's movements within the DOC indicate that plaintiff was confined at Dade CI from March 6, 2012, to January 18, 2013. (Doc. 54, Ex. C). During that 10-month period, plaintiff was briefly confined (from July 25, 2012, to October 1, 2012, and from January 4, 2013, to January 18, 2013) to an upper-tier cell. (Doc. 54, p. 2 ¶ 1 and Ex. C; Doc. 54, Ex. A, Hall Depo., p. 49). Plaintiff explained at his deposition that these were brief periods and that he was eventually moved to a low tier. (Doc. 54, Ex. A, Hall Depo., p. 49). Plaintiff was questioned at his deposition about whether he ever fell down the stairs at Dade CI when he was housed in an upper-tier cell. Plaintiff responded in the negative, explaining that he was "more stabilized" there because his hands were free and he was able to use the handrail with both hands. (Doc. 54, Ex. A, Hall Depo., pp. 48-50).

Plaintiff was asked at his deposition how many times he used the stairs at Santa Rosa CI between March 7, 2013, and April 15, 2013. Plaintiff responded that he used the stairs approximately five times prior to his fall, and that he was assisted by officers each time he used the stairs. (Doc. 54, Ex. A, Hall Depo., pp. 53-55). When asked about showering, plaintiff responded that he was sometimes allowed to use the

shower on the upper tier, depending on the officer.  (Doc. 54, Ex. A, Hall Depo., p. 54).

Plaintiff was asked at his deposition whether he ever filed a grievance with the classification department between March 13, 2013, and April 15, 2013, concerning his upper-tier cell.  Plaintiff responded in the negative.  (Doc. 54, Ex. A, p. 44).  The portion of plaintiff's deposition testimony containing his full explanation of why he did not file a grievance with classification was not included in defendants' summary judgment materials.  (*See* Doc. 54, Ex. A, p. 44).

Each defendant has submitted a declaration stating that between March 7, 2013, and April 15, 2013, he had no knowledge that plaintiff was at risk of falling down the stairs.  (Doc. 54, Ex. E, Gielow Decl. ¶ 1; Ex. F, Hood Decl. ¶ 1; Ex. G, Thornhill Decl. ¶ 1).  Defendants Hood and Thornhill dispute:  (1) that they saw plaintiff's medical pass issued on March 7, 2013; (2) that they received a copy of the March 7, 2013 pass; and (3) that they had any information concerning why it was issued.  (Doc. 54, Ex. F, Hood Decl. ¶ 2; Ex. G, Thornhill Decl. ¶ 2).  Defendants Hood and Thornhill also dispute that prior to plaintiff's fall, they observed any action by plaintiff that demonstrated an inability by him to safely go up or down the stairs.  (Doc. 54, Ex. F, Hood Decl. ¶ 1; Ex. G, Thornhill Decl. ¶ 1).  Defendant Gielow echoes this, and disputes having been informed by plaintiff of any issue with being housed in an upper-tier cell.  (Doc. 54, Ex. E, Gielow Decl.).  Defendant Gielow goes on to state that no one from classification, medical, or the administrative staff at Santa Rosa CI ever instructed him to move plaintiff to another cell prior to plaintiff failing on April 15, 2013.  (Doc. 54, Ex. E, Gielow Decl. ¶ 2).   Defendants Hood and Thornhill state that if an inmate receives a medical pass for some reason that requires a cell change, that inmate is still returned to his currently assigned cell; that the

housing officer is informed of the pass; that it is the housing officer's duty to make the cell change; that officers such as themselves cannot make cell assignments or move an inmate to another cell; and that neither of them were instructed to move plaintiff to another cell prior to plaintiff falling on April 15, 2013. (Doc. 54, Ex. F, Hood Decl. ¶ 3; Ex. G, Thornhill Decl. ¶ 3). Neither defendant Hood nor defendant Thornhill states that he informed the housing officer of plaintiff's pass, or that he contacted anyone in the classification department concerning plaintiff's pass. (*See* Doc. 54, Ex. F, Hood Decl.; Ex. G, Thornhill Decl.). Defendant Thornhill disputes plaintiff's statement that he (Thornhill) ordered plaintiff to descend the stairs unescorted on April 15, 2013, and states that he ordered plaintiff to remain at the top of the stairs until he could be escorted to the dayroom. (Doc. 54, Ex. G, Thornhill Decl. ¶ 4).

## DISCUSSION

Legal Standards

    A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 160 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* An issue is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). Generally, a court must view the facts in the light most favorable to the non-moving party (here, plaintiff) and draw all reasonable inferences in favor of that party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). The court may not, however, accept any facts that are "blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Moreover, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 869-70 (11th Cir. 2011).

B.     Qualified Immunity Standard

Defendants Gielow, Hood and Thornhill assert they are entitled to qualified immunity because plaintiff has not established that they violated his constitutional rights and, even if plaintiff made that showing, the right was not clearly established at the time of their conduct. (Doc. 54, pp. 4-10). "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 308, — L. Ed. 2d — (2015)

(*quoting Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)) (additional internal quotation marks and citation omitted).   Qualified immunity seeks to ensure that individuals can reasonably anticipate when their conduct may give rise to liability; hence, liability attaches only if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right.  *McElligott v. Foley*, 182 F.3d 1248, 1260 (11th Cir. 1999) (*citing United States v. Lanier*, 520 U.S. 259, 270, 117 S. Ct. 1219, 137 L. E d.2d 432 (1997)).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Id*. at 1194.

The Supreme Court has established a two-pronged test for evaluating a claim of qualified immunity:  (1) whether a constitutional right has been violated on the facts alleged; and (2) whether the right was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).  "A right may be clearly established for qualified immunity purposes in one of three ways:  '(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'"  *Maddox v. Stephens*, 727 F. 3d 1109, 1121 (11th Cir. 2013) (*quoting Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291-92 (11th Cir. 2009)).

The court exercises its discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 555 U.S. at 236. The court may grant qualified immunity if the plaintiff fails to carry his burden on either of the two prongs. *See, e.g.*, *Pearson* at 243-245 (granting qualified immunity after evaluating only *Saucier*'s second prong).

C.  Eighth Amendment Standard

All claims challenging conditions of confinement must demonstrate an infliction of pain "without any penological purpose" or an "unquestioned and serious deprivation of basic human needs" such as medical care, exercise, food, warmth, clothing, shelter, or safety. *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981); *see also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1571-72 (11th Cir. 1985). "To survive summary judgment in a case alleging deliberate indifference, a plaintiff must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (*quoting Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)). "The Eighth Amendment defines the contours of the first two elements and section 1983 delimits the third." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993).

The first element requires the following showing:

> First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992). The challenged condition must be "extreme." *Id*. at 9, 112 S. Ct. at 1000. While an inmate "need not await a tragic event" before seeking relief, *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2481, 125 L. Ed. 2d 22 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety, *id*. at 35, 113 S. Ct. at

2481.  Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

*Chandler v. Crosby*, 379 F.3d 1278, 1289-90 (11th Cir. 2004).  The objective prong is concerned with both the "severity" and the "duration" of the prisoner's exposure to the alleged unconstitutional condition.  *Id*. at 1295.

The second element, deliberate indifference, has three components:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."  *Goodman*, 320 F.3d at 1332 (internal quotation marks and citation omitted).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The Supreme Court in *Farmer* emphasized:

The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."  An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concerns when it imposes tort liability on a purely objective basis.  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

511 U.S. at 837-838 (citations omitted).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . .  and a factfinder

may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citations omitted).

The official's disregard of the risk of serious danger must be knowing or subjectively reckless. *Goodman*, 320 F.3d at 1332 (explaining, with regard to the deliberate indifference element, that the prisoner must establish that the defendants "knowingly or recklessly disregarded that risk"); *see also Farmer*, 511 U.S. at 836-840 (adopting a "subjective recklessness" test). "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

The prisoner must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995) (*citing Farmer*, 114 S. Ct. at 1978-79); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001 ("[O]fficials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk."). Prison officials may avoid Eighth Amendment liability by showing, for example: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer* at 844.

Application of Summary Judgment Standard to Plaintiff's Claims

There is no dispute that the defendants were acting within the scope of their discretionary authority at all times relative to this action.

    A.    Whether plaintiff has established the violation of a constitutional right

        i.    Objectively serious condition

Defendants argue that there is insufficient evidence plaintiff was placed at an unreasonable risk of serious damage to his future health and safety. (Doc. 54, p. 6). Defendants support this argument by referencing their evidence that plaintiff was housed in an upper-tier cell for a period of time at his prior institution, Dade CI, and that plaintiff had no incident for the first thirty-nine days he was housed in an upper-tier cell at Santa Rosa CI. "Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts. For summary judgment purposes, [this court must] resolve all the truly disputed facts in accord with [p]laintiff's view of the facts; but [the court] decide[s] the legal consequences of the given facts, that is, whether the supposed facts amount to a violation of the Eighth Amendment." *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005).

Defendants do not dispute that plaintiff has a sciatic nerve injury to his right leg with foot drop, and that he wears an AFO brace on his right ankle. Plaintiff's medical history includes physician-mandated medical  restrictions for a low bunk, a low-tier cell, soft shoes and a cane (when not confined in an area where canes are prohibited). Plaintiff describes that his right foot drags, that he struggles to walk and climb stairs, and that over-exertion of his right leg causes pain, numbness and collapse. These facts support the conclusion that plaintiff has a serious medical condition – one that is mandated by a physician as requiring treatment with particular

accommodations and restrictions.   These facts also support the conclusion that interfering with, or ignoring plaintiff's medical restrictions, and requiring him to use stairs creates a substantial risk of serious harm.

Defendants' evidence and arguments do not change this conclusion.   As plaintiff explained in his deposition, his housing in an upper-tier cell at Dade CI was for very brief periods and was in a setting where his hands were unrestrained so he could use the handrail to stabilize himself when negotiating the stairs.   Plaintiff also testified in his deposition that during his confinement at Santa Rosa CI preceding his fall, he was assisted by at least one correctional officer on the approximately five occasions he was required to use the stairs.   The summary judgment evidence, viewed in plaintiff's favor, satisfies the first component of an Eighth Amendment claim.

ii.     Deliberate indifference

Defendants offer four reasons why plaintiff cannot establish that they were deliberately indifferent to his health and safety.  First, defendants assert that they were not subjectively aware that plaintiff was at a substantial risk of serious harm.  (Doc, 54, pp. 607).  To support this contention, defendants attest by affidavit that they did not witness anything which would have alerted them that plaintiff was in danger of falling on the stairs; that none of them were aware of plaintiff's underlying medical condition; that plaintiff was housed in the upper tier at Santa Rosa CI for thirty-nine days without incident; that plaintiff admitted in his deposition that when people see him stand they think he is perfectly fine; and that plaintiff admits that even he did not know he was going to fall on April 15, 2013.  (Doc. 54, pp. 6-7 and Exs. E, F, G). Second, defendants assert that plaintiff cannot establish they acted unreasonably. (Doc. 54, p. 7).  Third, defendants Hood and Gielow assert that they were in no

position to stop plaintiff's injury, because they were not present when plaintiff fell. (Doc. 54, p. 8).  Fourth, defendants assert that there is no evidence plaintiff was harmed by his fall.  (Doc. 54, pp. 8-9).

The court finds that defendant Gielow's position finds support in the facts, which, even viewed in plaintiff's favor, do not support an inference that Gielow knew plaintiff was at a substantial risk of serious harm at the time Gielow encountered him, or at any other time prior to plaintiff's fall.  Plaintiff's sole evidence against Gielow is that he showed Gielow a copy of his medical pass on one occasion when Gielow passed by his cell, and that he complained to Gielow that the pass was not being honored.  Plaintiff was standing in his cell, not ambulating.  Plaintiff's medical pass ordered that plaintiff be allowed to retain his AFO splint for his right foot and that plaintiff be housed in a low-tier cell on a low/bottom bunk.  A defendant's knowledge of a medical pass, without more, is insufficient to establish deliberate indifference. *See, e.g., Redding v. Georgia*, 557 F. App'x 840, 844 (11th Cir. Feb. 18, 2014) (holding that plaintiff's allegation that prison officials assigned him to a top bunk contrary to his medical profile indicating the need for a bottom bunk failed to state a plausible Eighth Amendment claim; "It may have been negligent to assign Redding a bunk contrary to his profile, but an Eighth Amendment claim requires conduct rising to a level above even gross negligence.  This was not shown here, as Redding did not allege facts showing a culpable state of mind on the defendant's part." (citation omitted)).  Defendant Gielow asserts, and plaintiff does not provide evidence genuinely disputing, that Gielow never witnessed any action by plaintiff indicating he was unable to safely negotiate stairs.  Plaintiff does not allege, for example, that Gielow ever saw him walk or climb stairs, or that he described to Gielow the effect of such activity on his leg.  Although plaintiff says he "described [his] condition" to

Gielow, (Doc. 60, Ex. A, Hall Decl. ¶ 20), he does not say what, in particular, he conveyed. Construing the summary judgment evidence in the light most favorable to plaintiff, a reasonable jury could not infer – from Gielow's viewing plaintiff's medical pass on one occasion while plaintiff was standing in his cell – that Gielow had subjective knowledge that plaintiff was at a substantial risk of serious harm. Defendant Gielow is entitled to summary judgment on plaintiff's Eighth Amendment claim.

Plaintiff also fails to establish that defendant Hood was deliberately indifferent. "A claimant must prove that the prison official possessed both knowledge of the danger and the means to cure the danger." *May v. Hetzel*, — F. App'x —, 2015 WL 6715239, at *1 (11th Cir. Nov. 4, 2015) (*citing LeMarca*, 995 F.2d at 1535-37). The court in *LaMarca* explained:

> Because the Eighth Amendment requires a subjective standard, to demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition, "so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Duckworth*, 780 F.2d at 653. Thus, if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent unless he knows of, but disregards, an appropriate and sufficient alternative.

*Id.* at 1535-36 (*quoting Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985)).

Defendant Hood states, and plaintiff does not present evidence genuinely disputing, that Hood did not have the authority to move plaintiff to a low-tier cell and that protocol required Hood to return plaintiff to his upper-tier cell on March 13, 2013, pending reassignment. Plaintiff admits that Hood and Thornhill escorted him up the stairs, even though they did not actively assist him. Given that, according to plaintiff's deposition testimony, it was defendant Thornhill, not Hood, who possessed

a copy of the pass and promised to convey ARNP Nichols' reassignment request to the classification department, defendant Hood has shown that there is no genuine dispute of material fact on the issue of deliberate indifference, and that he responded reasonably to the situation by accompanying plaintiff up the stairs.

Plaintiff's claim against defendant Thornhill has three components:  (1) Thornhill's alleged inaction with regard to communicating to the classification department plaintiff's medical pass and need for reassignment, (2) Thornhill's alleged requiring plaintiff to climb the stairs and return to his upper-tier cell on March 13, 2013, and (3) Thornhill's alleged requiring plaintiff to descend the stairs unescorted and unassisted on April 15, 2013, while in hand restraints secured to his waist.

As with defendant Hood, defendant Thornhill states, and plaintiff does not present evidence genuinely disputing, that Thornhill did not have the authority to move plaintiff to a low-tier cell and that protocol required Thornhill to return plaintiff to his upper-tier cell on March 13, 2013, pending reassignment.  Plaintiff admits that Hood and Thornhill escorted him up the stairs.  This evidence establishes that defendant Thornhill responded reasonably to the risk confronting plaintiff at that time.

The same is not true of defendant Thornhill's remaining conduct – failing to communicate plaintiff's need for reassignment to a low tier (which could also be stated as a refusal to follow the clinician's instruction regarding plaintiff's care) and requiring plaintiff to descend the stairs on April 15, 2013, while in restraints and without an escort.  Resolving all factual disputes in plaintiff's favor, a reasonable jury could infer that defendant Thornhill knew plaintiff was at a significant risk of harm if he was not reassigned to a low tier and was required to use stairs.  According to plaintiff, at the time defendant Thornhill was given a copy of plaintiff's medical pass

on March 13, 2013, the clinician expressly directed him to move plaintiff to a low-tier cell.  Thornhill responded that he could not reassign plaintiff to a different cell, but he would contact the classification department to do so.  Defendant Thornhill then escorted plaintiff back to his wing, obviously observing plaintiff ambulate.  Plaintiff's description of his unsteady gait during the escort, and his medical records containing medical personnel's objective observations of plaintiff as walking with a limp, support an inference that plaintiff's gait was unsteady.  In addition, while escorting plaintiff up the stairs on March 13, 2013, Thornhill observed plaintiff "struggling walking up the stairs in restraints, every other step [having] to rest, due to [his] leg trembling and hav[ing] to drag it."  (Doc. 20, p. 10 ¶ 31; *see also id.* ("[T]hey saw my disabled leg trembling and me having to drag it while struggling to walk up the stairs")).  Thornhill's knowledge of a substantial risk can also be inferred from the disputed disciplinary report.  Accepting plaintiff's version of the April 15, 2013 incident as true, a reasonable jury could infer, from defendant Thornhill's generating the false disciplinary report after plaintiff fell – based on a claim that Thornhill ordered plaintiff to remain at the top of the stairs until he could be escorted and that plaintiff disobeyed the order – that Thornhill knew plaintiff's descending the stairs without an escort posed a substantial risk of injury.

The undersigned has considered the particular points defendants raise, but finds them unavailing.  The fact that defendant Thornhill was not advised of plaintiff's underlying medical condition does not mean that a layman could not tell, from observing plaintiff ambulate and struggle to negotiate stairs, that he had a serious medical condition which impaired his ability to ambulate and climb.  Plaintiff has submitted evidence, via affidavit from another inmate, that when one observes plaintiff walk, it is "obvious" that he is "handicapped."  Further, the fact that plaintiff

appears "fine" when standing says nothing of how he appears when ambulating or using stairs.  Additionally, the fact that plaintiff was housed in an upper-tier cell at Dade CI is of no relevance to the subjective deliberate indifference inquiry, as defendant Thornhill does not contend he was aware of that fact.  The fact that neither plaintiff nor defendant Thornhill "knew that [plaintiff] was going to fall on April 15, 2013", is also of little, if any, relevance.  Plaintiff need not show that defendant Thornhill acted or failed to act "believing that a harm actually would befall [plaintiff]; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.[5]  Were it to resolve all factual disputes in plaintiff's favor, a reasonable jury could infer that defendant Thornhill knew of and disregarded a substantial risk of serious harm to plaintiff's health and safety.

That does not end the analysis.  Defendant Thornhill argues that he, like defendant Hood, cannot be held liable because he lacked the means to cure the danger.

A reasonable jury could infer from Thornhill's alleged promise to the clinician – that he would communicate to classification plaintiff's need for a cell reassignment – that Thornhill could have taken that step to cure the danger.  Although plaintiff admits in his deposition that he has no personal knowledge whether defendant Thornhill contacted the classification department or informed the housing officer of plaintiff's medical pass, defendant Thornhill does not state what, if anything, he did with plaintiff's medical pass, and Thornhill denies recollection of ever seeing it, even though Thornhill does not deny he was present at the medical triage room at the time

---

[5]Had plaintiff admitted that he knew he was going to fall on April 15, 2013, he likely would have been accused of intentionally falling.

copies of the pass were distributed, and that he escorted plaintiff back to his wing. A reasonable jury could infer from this evidence that Thornhill took no action to communicate plaintiff's need for a cell reassignment. This inference is also supported by evidence that plaintiff remained in his upper-tier cell for thirty-three days after the pass issued, and that he was reassigned, immediately, only after he fell. Defendant Thornhill attempts to deflect responsibility by questioning plaintiff's failure to file a grievance with the classification department, but it was Thornhill's responsibility to communicate the clinician's instructions to the classification department. *See, e.g., Jones v. Evans*, 544 F. Supp. 789, 775 (N.D. Ga. 1982) ("[A] non-medical, prison employee's refusal to follow a doctor's instruction regarding a prisoner's care can almost never be characterized as other than deliberate and indifferent."). Further, the excerpts from plaintiff's deposition testimony indicate that plaintiff did not come into personal contact with any classification officials; that he feared retaliation if he filed a grievance; and that he may have been unaware of, or confused about, how to remedy the issue. (*See* Doc. 54, Ex. A, Hall Depo, pp. 43-44).

Additionally, regardless of whether Thornhill communicated plaintiff's need for reassignment to the classification department, a factual dispute exists over whether Thornhill required plaintiff, on April 15, 2013, to descend the stairs from his upper-tier cell in hand restraints secured to his waist, without an officer escort. A jury resolving this factual dispute in plaintiff's favor could find that Thornhill acted in reckless disregard for plaintiff's safety.

Finally, although it is arguable whether plaintiff has submitted medical evidence raising a genuine dispute as to whether the fall <u>worsened</u> his condition, a reasonable jury could infer, from plaintiff's description of the fall and its effect on him, that he was injured as a result of defendant Thornhill's conduct.

iii.    Causation

Defendants' motion for summary judgment does not assert that plaintiff cannot establish the element of causation as to defendant Thornhill, so the court will not address that issue.  (Doc. 54, pp. 6-9).

iv.    Conclusion

Viewing the summary judgment evidence in the light most favorable to plaintiff, a reasonable jury could <u>not</u> find that defendants Gielow and Hood violated the Eighth Amendment.  Whether defendant Thornhill violated plaintiff's Eighth Amendment rights requires resolution of disputed factual issues.

B.    Whether existing precedent in March of 2013 clearly established that defendant Thornhill's conduct violated plaintiff's rights under the Eighth Amendment

Defendants argue that plaintiff fails to meet the second prong of the qualified immunity test, because counsel "could find no published case from the U.S. Supreme Court, the Eleventh Circuit, or the Florida Supreme Court that found a constitutional violation under the very unusual facts of this case."  (Doc. 54, p. 10).  In response, plaintiff advances five cases as clearly establishing the unlawfulness of defendant Thornhill's conduct:  *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1330 (11th Cir. 2007); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); and *Farmer v. Brennan, supra*.  (Doc. 60, pp. 3, 6).

In recent cases the United States Supreme Court has addressed the "clearly established law" prong of the qualified immunity analysis.  The Court's most recent decision addressing the issue, *Mullenix, supra*,, emphasizes the principles governing this court's analysis:

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. —, — (2012) (slip op., at 5) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

"We have repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd, supra*, at 742. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid*. (emphasis added). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam ) (*quoting Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).

136 S. Ct. at 308.

The question in this case is whether binding precedent in March of 2013, namely, a holding of the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court, gave defendant Thornhill fair warning that his conduct violated the Eighth Amendment. The analysis must focus on defendant Thornhill's conduct in the situation he confronted. *Mullenix*, 136 S. Ct. at 308; *Brosseau*, 543 U.S. at 199-200.

The potential bases for unconstitutional conduct here, with regard to defendant Thornhill, is (1) Thornhill's inaction when faced with plaintiff's prescribed medical restriction and the clinician's order for reassignment to a low tier (Thornhill's failure to notify personnel responsible for cell assignments that plaintiff's housing assignment was contrary to his prescribed medical restriction and that the clinician

had ordered plaintiff's reassignment to a low tier); and (2) Thornhill's requiring plaintiff, on April 15, 2013, to descend the stairs from the upper tier while in hand restraints secured to his waist and without escort, knowing that plaintiff's condition caused him to limp and drag his right foot and required an AFO brace, knowing that plaintiff was improperly housed on the upper tier, knowing that plaintiff had a prescribed medical restriction to a low tier, and knowing, through observation on at least one occasion (the medical escort on March 13, 2013), that it was difficult for plaintiff to negotiate stairs.[6]

The Supreme Court's holding in *Estelle* sets forth the general rule that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.*, 429 U.S. at 104 (internal quotation marks and citation omitted).  The Eleventh Circuit has described the *Estelle* decision as "recogniz[ing] that the Eighth Amendment requires the government 'to provide medical care for those whom it is punishing by incarceration' precisely because the failure to do so 'may actually produce physical torture or a lingering death' or, '[i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose.'"  *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (*quoting Estelle*, 429 U.S. at 10) (additional internal quotation marks omitted).

In *Farmer v. Brennan*, the Court defined the term "deliberate indifference" in the context of a prisoner's claim that prison officials violated the Eighth Amendment by their deliberate indifference to his safety (placing the transsexual prisoner in the

---

6The court previously determined that Thornhill's requiring plaintiff to climb the stairs, while escorted, after returning from the medical room on March 13, 2013, did not violate the Eighth Amendment.

general population, thereby failing to keep him from harm allegedly inflicted by other inmates). The *Farmer* Court held that Eighth Amendment liability requires actual awareness of a substantial risk of serious harm; thus, prison officials may be liable if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it. 511 U.S. at 847.

In *Goebert v. Lee Cnty.*, 510 F.3d 1312 (11th Cir. 2007), the Eleventh Circuit denied qualified immunity to a non-medical jail official (the jail's facility commander) who failed to respond to a pregnant inmate's complaint that she needed immediate medical care. The Eleventh Circuit held that four prior cases, *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994); *McElligott v. Foley*, 182 F.3d 1248, 1260 (11th Cir. 1999); *Mandel v. Doe*, 888 F.2d 783, 788-90 (11th Cir. 1989), and *Carswell v. Bay Cnty.*, 854 F.2d 454 (11th Cir. 1988), were sufficiently similar to have put the jail commander on notice that his actions or inaction violated Ms. Goebert's constitutional right to timely treatment of her serious medical needs. In *Harris*, the Eleventh Circuit held that "[i]naction in the face of a known serious medical need [and] a prescribed course of care . . . is not conduct that a sheriff could reasonably consider lawful." *Harris*, 21 F.3d at 394.

Plaintiff identifies *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) as relevant, preexisting authority, but that case cannot form the basis for overcoming qualified immunity, because it did not exist in 2013 – the time of defendant Thornhill's conduct. *Caldwell* did, however, rely on the relevant, preexisting decision of *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003). As the *Caldwell* court described, *Cottone* held that "the total failure to monitor or supervise a visibly violent, mentally unstable, schizophrenic inmate who was housed in a separate unit for mentally ill inmates and who posed a substantial risk of serious harm

to other inmates in that housing unit constituted deliberate indifference." *Caldwell*, 748 F.3d at 1102 (*citing Cottone*, 326 F.3d at 1358-59).

Whether one characterizes the constitutional right at issue here as the right to attention to medical needs, the right to safety, or both, it "requires little creativity or imagination", *Telfair v. Gilbery*, 868 F. Supp. 1396, 1403 (S.D. Ga. 1994), for a reasonable non-medical prison official to guess that knowingly disregarding a partially disabled prisoner's prescribed medical restriction, knowingly disregarding the clinician's express written order and verbal request to take the steps necessary to effectuate the medical restriction, and requiring the prisoner to engage in the medically-restricted activity (here, climbing stairs) under circumstances known to create a high risk of injury might constitute a constitutional violation.  Given the abundance of preexisting case law, discussed above, defining the parameters of deliberate indifference, this court cannot say that defendant Thornhill lacked fair warning that his conduct violated the Eighth Amendment. *Gray ex. rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) ("Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious.").

Accordingly, it is ORDERED:

1.  Defendants Gielow, Hood and Thornhill's request to stay discovery (doc. 54, p. 1 n.1 and p. 11), is DENIED as moot.

And it is respectfully RECOMMENDED:

1.  That defendants' motion for summary judgment (doc. 54) be GRANTED IN PART and DENIED IN PART as follows:

  a.  That summary judgment be GRANTED in favor of defendants Gielow and Hood, on the basis of qualified immunity.

      b.     That summary judgment be DENIED to defendant Thornhill.

    2.    That this matter be referred to the undersigned for further pretrial proceedings on plaintiff's individual capacity Eight Amendment claim against defendant Thornhill.

    At Pensacola, Florida this 29th day of December, 2015.


                          /s/ *Charles J. Kahn, Jr.*
                          **CHARLES J. KAHN, JR.**
                          **UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

    Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cɪʀ. R. 3-1; 28 U.S.C. § 636.